## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JOSEPH BOLTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 11-1325-JWL** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying disability insurance benefits (DIB) and Supplemental Security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding error in the Commissioner's failure to consider whether Plaintiff's condition might meet or equal Listing 12.05C, the court ORDERS that the decision is REVERSED, and that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING the case for further proceedings.

## I.      Background

Plaintiff filed both his seventh SSI application since 1992 and his third DIB application since 2000 on March 22, 2007, alleging disability beginning February 1,

2007.  (R. 9-10, 207-21).  The applications were denied initially and upon

reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge

(ALJ).  (R. 10, 101-04, 126-27).  Plaintiff's request was granted, and Plaintiff appeared

with counsel for a hearing before ALJ Jack D. McCarthy on April 7, 2010.  (R. 10, 29-

83).  At the hearing, testimony was taken from Plaintiff, from a vocational expert, and

from two medical experts.  Id.  On July 30, 2010 ALJ McCarthy issued his decision,

finding Plaintiff is not disabled within the meaning of the Act, and denying his

applications.  (R. 9-20).  Plaintiff requested, but was denied review of the ALJ's decision

by the Appeals Council.  (R. 1-5).  Therefore, the ALJ's decision became the final

decision of the Commissioner.  (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir.

2006).  Plaintiff timely filed this case, seeking judicial review of the Commissioner's

decision.  (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi,

422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048,

1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d

1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C.

§ 405(g)); see also, 42 U.S.C. § 1383(c)(3) (SSI decision "shall be subject to judicial

review as provided in section 405(g)").  Section 405(g) provides for review of a final

decision of the Commissioner made after a hearing in which the Plaintiff was a party.  It

also provides that in judicial review "[t]he findings of the Commissioner as to any fact, if

2

supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such evidence as a reasonable mind might accept to support a conclusion. Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least twelve months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)); see also, Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A)).  The claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot, considering his age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step sequential process to evaluate disability.  20 C.F.R. §§ 404.1520, 416.920 (2010); Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining whether claimant can perform past relevant work; and whether, considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on claimant to prove a disability that prevents

performance of past relevant work. <u>Blea</u>, 466 F.3d at 907; <u>accord</u>, <u>Dikeman v. Halter</u>, 245 F.3d 1182, 1184 (10th Cir. 2001); <u>Williams</u>, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy within Plaintiff's capability. <u>Id.</u>; <u>Haddock v. Apfel</u>, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ failed to consider the complete record regarding his mental condition, failed to consider whether his condition meets or equals the severity of Listing 12.05C, and erroneously rejected the opinion of his treating physician, Dr. Penn. The Commissioner argues that the ALJ properly did not consider Listing 12.05C, and properly evaluated the opinion of Dr. Penn. The court finds that remand is necessary because the ALJ did not consider whether Plaintiff's condition might meet or equal the severity of Listing 12.05C. Because this is a step three error, after properly evaluating Listing 12.05C, the ALJ will be required to once again evaluate the opinion evidence. Plaintiff may make his arguments regarding Dr. Penn's opinion to the Commissioner on remand.

## III.   Listing 12.05C

Plaintiff points out that the ALJ recognized that IQ testing was performed on Plaintiff on August 11, 2007. (Pl. Br. 9) (citing R. 17). He points out that the results and report of that IQ testing were not included in the administrative record either before the ALJ or before this court. <u>Id.</u> He argues that the report was necessary for a proper consideration of whether Plaintiff's condition meets or equals a mental listing, and the ALJ's failure to secure the report constitutes a failure of the ALJ's duty to complete the

record.  (Pl. Br. 9-11).  Plaintiff next argues that the failure to secure and consider the results and report of the IQ testing resulted in an erroneous failure to consider whether Plaintiff's condition meets or equals the severity of Listing 12.05C.  Id. at 13-16.  He argues that there is record evidence suggesting that Plaintiff's condition might meet each of the criteria of Listing 12.05C but that without the results and report of his IQ testing it is impossible to ascertain whether the Listing is met, and the ALJ erred by not considering whether the Listing is met.  Id.  Finally, Plaintiff argues that the error in failing properly to consider Listing 12.05C is not harmless because Listing 12.05C assumes that an individual who is mildly mentally retarded will be able to work unless or until he develops a "severe" physical or other "severe" mental impairment, and therefore a finding that an individual is able to work at step four or five without first considering mild mental retardation at step three cannot overcome the step three error of failing to consider the Listing.  Id. at 16-18.

The Commissioner acknowledges that when the ALJ does not consider whether Listing 12.05 is met, "the court is unable to 'employ the customary review process.'" (Comm'r Br. 4) (quoting Bland v. Astrue, 432 F. App'x 719, 722 (10th Cir. 2011).  He argues, however, that there was no error because Plaintiff was represented by counsel at the hearing, counsel did not argue that Listing 12.05C was met, and the record evidence was insufficient to suggest that the Listing should have been considered sua sponte. (Comm'r Br. 4-5).  The Commissioner argues that this case is "remarkably congruent" with Bland, and should reach the same result.  He asserts that counsel did not argue that

Plaintiff's condition meets Listing 12.05, declined to question the psychological expert, Dr. Kravitz, despite Dr. Kravitz's failure to specifically address Listing 12.05C, and focused on matters other than mental retardation.  Id. at 5.

The Commissioner argues that the record supports the ALJ's finding that Plaintiff had a severe impairment of borderline intellectual functioning, but "does not reasonably suggest that the ALJ had an affirmative duty to consider sua sponte Listing 12.05C."  Id. at 5-6.  This is so in the Commissioner's view because Plaintiff did not allege disability based upon deficits in intellectual functioning, the record evidence is that Plaintiff was diagnosed with borderline intellectual functioning rather than mild mental retardation, and Dr. Mintz concluded that Plaintiff did not appear mentally retarded and opined that he could perform appropriate mental work-related activities.  Id. at 6.  He argues that the testimony of the psychological expert and of the vocational expert also suggest there was no need to consider Listing 12.05C because that testimony reveals Plaintiff had previously performed skilled work and had held some fairly responsible positions which are inconsistent with mild mental retardation.  Id. at 6-7.  The Commissioner concludes that "nothing in the administrative record suggests that Plaintiff had mental retardation. Because Plaintiff's attorney failed to argue that [sic] his IQ of 70 and his additional severe impairments, the ALJ had no obligation to consider Listing 12.05C, and remand is not warranted."  (Comm'r Br. 7).

### A. Duty to Develop the Record

As Plaintiff points out, in the case of <u>Madrid v. Barnhart</u> the Tenth Circuit set out

the law regarding an ALJ's duty to develop the record:

> "It is beyond dispute that the burden to prove disability in a social security
> case is on the claimant."  <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164 (10th
> Cir. 1997); 20 C.F.R. § 404.1512(a) ( "[Y]ou must bring to our attention
> everything that shows that you are ... disabled.").  Nevertheless, because a
> social security disability hearing is a nonadversarial proceeding, the ALJ is
> "responsible in every case 'to ensure that an adequate record is developed
> during the disability hearing consistent with the issues raised.' "  <u>Hawkins</u>,
> 113 F.3d at 1164 (quoting <u>Henrie v. United States Dep't of Health &</u>
> <u>Human Servs.</u>, 13 F.3d 359, 360-61 (10th Cir. 1993)); 20 C.F.R. § 404.944
> (requiring the ALJ to "look[ ] fully into the issues").  Generally, this means
> that the "ALJ has the duty to ... obtain [ ] pertinent, available medical
> records which come to his attention during the course of the hearing."
> <u>Carter v. Chater</u>, 73 F.3d 1019, 1022 (10th Cir. 1996).  Moreover, the ALJ's
> "duty is heightened" when a claimant, like Mr. Madrid, appears before the
> ALJ without counsel.  <u>Henrie</u>, 13 F.3d at 361; <u>Musgrave v. Sullivan</u>, 966
> F.2d 1371, 1374 (10th Cir. 1992) (same); <u>see also</u> <u>Dixon v. Heckler</u>, 811
> F.2d 506, 510 (10th Cir. 1987) ("The [ALJ's] duty of inquiry takes on
> special urgency when the claimant has little education and is unrepresented
> by counsel.").

447 F.3d 788, 790 (10th Cir. 2006)

Nevertheless, as the Commissioner argues, in a counseled case, "An ALJ generally

may 'rely on the claimant's counsel to structure and present claimant's case in a way that

the claimant's claims are adequately explored, and the ALJ may ordinarily require

counsel to identify the issue or issues requiring further development.'" <u>Bland</u>, 432 F.

App'x at 722 (quoting <u>Branum v.Barnhart</u>, 385 F.3d 1268, 1271 (10th Cir. 2004)).

Although Plaintiff's counsel did not argue that Listing 12.05C is met and did not

make an opening statement or a closing statement, the court sees no basis in the facts of

this case to excuse the failure of the ALJ to ensure that an adequate record was developed

consistent with the issues raised at the hearing.  First, the ALJ did not ask counsel if he desired to make an opening or a closing statement, and did not ask him to inform the adjudicator of his theory of the case.  In other words there is simply no indication in the record that the ALJ sought to rely on counsel to structure and present the issues that should be developed.  Second, there is no evidence that counsel invited the error by misleading or misdirecting the adjudicator regarding the issue of Listing 12.05C.

Third, and perhaps most importantly, the issue of Plaintiff's intellectual functioning was clearly presented at the hearing, and the question of whether Listing 12.05C was met was clearly placed in issue.  Perhaps counsel should have expressed concern that the results and report of Plaintiff's IQ testing must be secured and considered.  But nonetheless, the availability of the results and report of Plaintiff's IQ testing was clearly brought to the ALJ's attention at the hearing, the record evidence suggests that Listing 12.05C might be met, and the ALJ had an independent duty to consider whether the Listing was met.  Since the evidence indicates that the IQ results and report had been in the record but was apparently misplaced by the agency and was no longer in the record, it was the duty of the ALJ to secure that evidence and consider whether Listing 12.05C was met or equaled.  Significantly, the evidence at issue here was not merely one of Plaintiff's medical records which had not been provided by Plaintiff for the agency's consideration, but it was a record procured specifically by the agency and was solely within the agency's custody and control when it disappeared from the record.

In the decision, the ALJ accorded "substantial weight" to Dr. Kravitz's opinion (R. 13), and he summarized the "most probative portions of Dr. Kravitz's testimony."  (R. 17-18).  As relevant to this discussion, three of those "most probative portions" are quoted here:

> Following a consultative psychological examination on June 30, 2007 by Stanley I. Mintz, Ph.D., the claimant was diagnosed with the following: cognitive disorder, not otherwise specified (NOS); polysubstance abuse, in remission; borderline intellectual functioning; and personality disorder, not otherwise specified (NOS) (Exhibit 7F [(R. 511-15)]).
>
> The claimant's work record suggests intellectual functioning in the borderline to low average level.  However, in the State agency psychologist's assessment there is a reference to IQ testing that was done on August 11, 2007 (Exhibit 13F, p. 13 [(R. 539)]).  The results of the testing indicated a Verbal IQ of 70, a Performance IQ of 80, and a Full Scale IQ of 73, placing the claimant in the borderline range of intellectual functioning.

(R. 17).

> He [Dr. Kravitz] has evaluated the claimant's mental functioning under listings 12.02, 12.08, and 12.09.  He agrees with the "paragraph B" criteria and "paragraph C" criteria opined by Dr. Schulman in Exhibit 13F. [(R. 527-40)].

(R. 18).

> Here is Dr. Kravitz's hearing testimony with regard to this issue:
>
> A    Claimant has been diagnosed with a cognitive disorder.  Or the diagnosis is actually would consider cognitive disorder in Exhibit 7-F [(R. 511-15)] and 6/30/07, CE [(consultative examination)].  Polysubstance abuse in remission was diagnosed.  Consider border[line] intellectual functioning was diagnosed and a personality disorder was diagnosed.
> I see in the PRTF [(Psychiatric Review Technique Form)] that was previously done, I believe that was 8/22/07, I not[e] the reference to a [INAUDIBLE] [(full scale?)] I.Q. of 73, subsequent to an 8/11/07

10

evaluation.  But honestly I did not find that report in the file, but I would, based on the reference to that, support the -- I mean, support the diagnosis of borderline intellectual functioning. So, it's more than just consider.

Q       Now, tell me which report you did not find in the file, is it the I.Q. testing or --

A       Yeah.  I could not find the I.Q. testing itself.  I only found the reference to the I.Q. testing.  If you could direct me to that report, if it's in the file --

Q       I'm not sure that it is.

* * *

A       Well, based on the reference to the [full scale IQ of] 73 and the consider -- cognitive consider borderline intellectual functioning, I think the diagnosis of borderline intellectual functioning is supported, and that's pretty much it, Judge.

(R. 55-56).

Two questions later, the testimony returned to Plaintiff's intellectual abilities:

Q       Actually, the let me 24-F goes up to -- into October of '09. [sic]  But I don't know if that's -- well, I'm not sure if it's in that one, because that seems to be mostly about physical impairments.  But, anyway, alright.  According to the PRTF, doesn't it find an I.Q. -- let me look at it.  The claimant has several prior cases, and I'm guessing that's from a prior case.

A       Oh, that's very possible.

Q       It talks about a verbal I.Q. of 70, performance of 80 and full scale of 73.  It goes on to explain that they -- they do not think the claimant has mental retardation if I recall, because they evaluated it under 12.02 and not 12.05.  What's your view on borderline intellectual functioning versus mental retardation and 12.02 versus 12.05:

11

A      Let me just pull out for the record before I [INAUDIBLE].  Yeah, certainly, I would support that.  Looking at the claimant's -- the record wouldn't support mild MR [(mental retardation)].  I'm looking at the record, the work record.  I just pulled that up [INAUDIBLE] Exhibit 4-E -- in addition to the fact that the claimant's I.Q. [INAUDIBLE] into the borderline range, you have a work history of some fairly responsible positions.  A crew chief for a fast food restaurant.  A welding -- I guess a welder [INAUDIBLE] in a meat factory, machine operator for a paper company, taxi driver. All of these occupations would suggest intellectual functioning in the borderline to average range.  In terms of the functional limitations, well, first, let me take from a mental perspective, claimant does not meet or equal a listing.

(R. 56-57).  Finally, the ALJ asked Dr. Kravitz what Listings she applied:

Q      Alright. Okay, now, which listings would you rate his impairments under.

A      Well, 12.02 for the borderline intellectual functioning. 12.08 for the personality disorder [INAUDIBLE] 12.09 for the polysubstance abuse. And I think that would be it, Judge.

(R. 59).

The only mention of Dr. Mintz's consultative psychological examination in the decision was in the ALJ's summary of the "most probative portions" of Dr. Kravitz's testimony.  From that summary, and in context, it seems the ALJ credited these "most probative portions" of Dr. Kravitz's testimony, and determined that Dr. Mintz diagnosed Plaintiff with borderline intellectual functioning; that Plaintiff's work record suggests low average intellectual functioning but that the IQ score results from August 11, 2007 confirm borderline intellectual functioning; and that Dr. Kravitz considered Listings 12.02 (Organic Mental Disorders), 12.08 (Personality Disorders), and 12.09 (Substance

Addiction Disorders), and agreed with Dr. Schulman, the psychologist who reviewed the record for the agency, that these Listings are not met.

A review of Dr. Kravitz's testimony reveals a slightly different conclusion. He testified that Dr. Mintz diagnosed Plaintiff with "consider border[line] intellectual functioning" but that the full scale IQ score of 73 supported a diagnosis of "borderline intellectual functioning" rather than merely considering such a diagnosis. (R. 55). Thereafter, the ALJ expressed his "guess" that the IQ testing was from one of Plaintiff's prior disability cases, and read the scores from Dr. Schulman's PRTF--70 verbal, 80 performance, and 73 full scale. (R. 56-57). The court notes that the sequence of events detailed below demonstrates that the IQ testing was done in conjunction with <u>this</u> case, not a prior disability case. He also interpreted the PRTF to "explain that they -- they do not think the claimant has mental retardation if I recall, because they evaluated it under 12.02 and not 12.05." (R. 57). He then asked Dr. Kravitz, "What's your view on borderline intellectual functioning versus mental retardation and 12.02 versus 12.05?" <u>Id.</u> Dr. Kravitz opined that "the record wouldn't support mild MR [(mental retardation)]," but the IQ in the borderline range and the work history with "some fairly responsible positions" would "suggest intellectual functioning in the borderline to average range," and he concluded that "claimant does not meet or equal a listing." <u>Id.</u> When asked which Listings he would rate Plaintiff's impairments under, Dr. Kravitz responded that he would rate the borderline intellectual functioning under Listing 12.02, and the polysubstance abuse under Listing 12.09.

13

Dr. Kravitz clearly did not believe Listing 12.05 for mild mental retardation applied to Plaintiff because of his work history and his full scale IQ score of 73. However, he stated he rated Listings 12.02 and 12.09. The ALJ stated that Dr. Schulman evaluated Listing "12.02 and not 12.05," and the record reveals that Dr. Schulman found impairments of 12.02, 12.08, and 12.09. As Plaintiff points out, the ALJ did not even mention Listing 12.05 in the decision. As this discussion makes clear <u>no one</u> evaluated Plaintiff's condition under Listing 12.05.

Nevertheless, and contrary to Dr. Kravitz's opinion and the ALJ's apparent determination, the record evidence suggests that Listing 12.05C might be met. Therefore, remand is necessary for the ALJ to secure the results and report of Plaintiff's IQ testing and to evaluate whether Listing 12.05 is met or equaled.

### B.     Standard for Evaluating Listing 12.05

Listing 12.05 provides:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.     Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; Or

B.     A valid verbal, performance, or full scale IQ of 59 or less; Or

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D.     A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1.     Marked restriction of activities of daily living; or
    2.     Marked difficulties in maintaining social functioning; or
    3.     Marked difficulties in maintaining concentration, persistence, or pace; or
    4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

Listing 12.05 is somewhat different than the other listings for mental disorders.

Id., § 12.00A.  The listing contains a diagnostic description (capsule definition) of mental

retardation (introductory paragraph) and four sets of criteria describing listing-level

severity (Paragraphs A through D).  20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 12.00A,

12.05(A-D).  Paragraphs A through D provide four distinct and independent ways in

which an individual having significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental period

might satisfy the criteria of Listing 12.05.  Id.; McKown v. Shalala, No. 93-7000, 1993

WL 335788, *1 (10th Cir. Aug. 26, 1993).  To meet the listing, a claimant must show that

his condition satisfies both the diagnostic description of mental retardation and any one of

the four severity criteria.  Id., § 12.00A.

Paragraphs A through D of Listing 12.05 contemplate that mental retardation may

be presumptively disabling in four distinct ways.  Listing 12.05A contemplates a situation

15

in which mental retardation results in dependance upon others for personal needs and an inability to follow directions.  Listing 12.05B contemplates a situation in which intelligence testing establishes that an individual is more than mildly mentally retarded. Listing 12.05B presumes an individual with mental retardation and a valid IQ score of 59 or below is disabled.  According to the American Psychological Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 42 (4th ed., Text Revision 2000) ("DSM-IV-TR"), IQ levels in the range of 50-55 to approximately 70 are described as "Mild Mental Retardation," whereas IQ levels below 50-55 are described as "Moderate," "Severe," or "Profound" Mental Retardation.  <u>Id.</u>  In light of the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Listing 12.05B represents a policy decision by the SSA that all individuals (provided they meet the diagnostic description for mental retardation) with valid IQ scores placing them in an area of  "Moderate," "Severe," or "Profound" Mental Retardation are conclusively presumed to be disabled.  Listing 12.05C contemplates the situation of an individual who is only Mildly Mentally Retarded, but is conclusively presumed disabled because he also has "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Listing 12.05D contemplates the situation of an individual who is only Mildly Mentally Retarded, but is conclusively presumed disabled because his Mild Mental Retardation results in "marked" limitations or repeated episodes of decompensation in at least two of the four broad mental functional areas identified by the Commissioner.

The Commissioner, in promulgating Listing 12.05C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlement to disability benefits.  Brown v. Sec'y of Health and Human Servs., 948 F.2d 268, 270 (6th Cir. 1991).  DSM-IV-TR describes mild mental retardation thus:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable."  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR 43 § 317.00 (emphases added).

DSM-IV-TR and the regulations in Listing 12.05C and Listing 12.05D assume many mildly mentally retarded individuals will be able to work.  The regulations account for the fact that some may become unable to work in two ways.  Listing 12.05D expresses the understanding that certain individuals will be unable to work because their mild mental retardation results in "marked" limitations or repeated episodes of decompensation in at least two of the four broad mental functional areas.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05D(1-4).  This listing implies that such an individual will be able to work unless or until his mild mental retardation results in those marked limitations or repeated

episodes of decompensation.  Listing 12.05C expresses the understanding that certain mildly mentally retarded individuals will become unable to work because they also develop "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C). This listing implies that such an individual will be able to work unless he has, or until he develops, a severe physical impairment or an additional severe mental impairment.  To meet or equal Listing 12.05C, a claimant must show three criteria are met:  (1) evidence of onset of mental retardation before age twenty-two, (2) a valid IQ score of 60 through 70, and (3) a severe physical or mental impairment in addition to mental retardation. Wall, 561 F.3d at 1062.

The regulations provide that where verbal, performance, and full scale IQ scores are derived from a test, the lowest score of the three will be used when considering Listing 12.05.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c).  If the claimant has an additional physical or mental impairment(s) which is "severe" within the meaning of 20 C.F.R. §§ 404.1520(c), 416.920(c), it will be considered to impose an additional and significant work-related limitation of function satisfying that criterion of Listing 12.05C. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(A); see also, Hinkle v. Apfel, 132 F.3d 1349, 1352-53 (10th Cir. 1997) (reaching the same conclusion before the regulations were changed in 2000 to specify the equivalence between "severe" impairments and "additional and significant work-related limitation of function.").

18

Dr. Kravitz's testimony takes account of Listings 12.05A, and B, but it does not seem to account for Listing 12.05C.  Her focus on the full-scale IQ score of 73 as related to borderline intellectual functioning rather than mild mental retardation ignores the fact that Plaintiff had a verbal IQ score of 70 and that the regulations specifically provide that the Commissioner will use the <u>lowest</u> IQ score of the three when considering Listing 12.05.  Despite Dr. Kravitz's testimony, the record evidence suggests Plaintiff has met the IQ criterion of Listing 12.05C.  However, because the report of Plaintiff's IQ is not in the record and has never been evaluated pursuant to Listing 12.05C, there is no record evidence whether Plaintiff's IQ scores are "valid" within the meaning of the Listing.

Dr. Kravitz's focus on the fact of Plaintiff's prior work does not account for Listing 12.05C's assumption that an individual who is mildly mentally retarded will often be able to work unless or until he develops another severe physical or mental impairment in addition to mild mental retardation.  The facts that an individual lives and functions independently, is able to work, and has attended schooling (even beyond high school) have been held in several cases to be facts which are not inconsistent with mild mental retardation.  <u>Markle v. Barnhart</u>, 324 F.3d 182 (3rd Cir. 2003) (obtained GED, employed painting, wallpapering and cutting grass, able to use judgment, function independently, work well with others, and maintain attention and concentration); <u>Morales v. Apfel</u>, 225 F.3d 310, 318 (3rd Cir. 2000) (work as a landscaper, laborer and packing line worker); <u>Brown</u>, 948 F.2d at 270 (could follow a road atlas and had worked as a truck driver); <u>McKown</u>, 1993 WL 335788 (graduated from high school and had spent two semesters in

college); <u>Nieves v. Sec'y of Health and Human Servs.</u>, 775 F.2d 12, 14 (1st Cir. 1985)

(worked as a seamstress).  Here, despite Plaintiff's earlier ability to work, the ALJ found,

and the record evidence supports that Plaintiff has met the criterion of Listing 12.05C

requiring "a physical or other mental impairment imposing an additional and significant

work-related limitation of function."  The ALJ found <u>multiple</u> additional severe

impairments which satisfy this criterion including HIV infection, left wrist pain, right

knee pain, right shoulder adhesive capsulitis, personality disorder, and polysubstance

abuse.  (R. 12).

The sequence of proceedings before the state disability determination service

perhaps best illustrates the error in the ALJ's failure to secure the IQ testing results and

report.  Plaintiff was referred to Dr. Mintz for a consultative mental status examination on

June 30, 2007.  (R. 513).  Dr. Mintz provided a report of that examination in which he

noted that Plaintiff "appears to exhibit some cognitive confusion and disorientation," that

he dropped out of school in the twelfth grade and <u>was in special education</u>, and that he

was not fully oriented as to situation.  <u>Id.</u> at 513-14.  Dr. Mintz stated, "Mr. Bolton

appears to function within the borderline range, he does not strike me as being mentally

retarded, he does appear to be noting cognitive and memory loss and he may be

exhibiting symptoms of a cognitive disorder.  <u>I am just not certain based on just this</u>

<u>interview.</u>"  <u>Id.</u> at 514 (emphasis added).  Dr. Mintz diagnosed "Consider Cognitive

Disorder," and "Consider Borderline Intellectual Functioning."  <u>Id.</u> at 515.  He provided

the following "Summary and Recommendations:"

> Mr. Joseph Bolton appears as a pleasant gentleman.  He appears able to understand simple and intermediate instructions.  He has related adequately to people <u>in the past in terms of working.</u>  His concentration capacity appears fair.  <u>He does not appear fully capable of handling his own funds due to possible cognitive disorder symptoms</u> and a history of drug abuse.

<u>Id.</u> (emphasis added).

The record reflects that Dr. Mintz expressed uncertainty regarding cognitive disorder and borderline intellectual functioning based merely on a one-time examination. He expressed that Plaintiff related adequately at working in the past, but he also recognized that Plaintiff might have difficulty handling his own funds due to cognitive disorder and drug abuse.

After receiving Dr. Mintz's evaluation, on July 12, 2007 the disability examiner requested a PRTF/MRFC (Mental Residual Functional Capacity) assessment, and noted that "Less than SUW [(simple unskilled work)] would allow."  (R. 516).  In response to the request for PRTF/MRFC, Dr. Schulman instructed the examiner on July 26, 2007, "please buy wais iii, wms iii, trails ab, and put an seqy in the file thanks."  (R. 517).  On August 16, 2007, after the requested IQ testing had been completed on August 11, 2007, the disability examiner again requested a PRTF/MRFC assessment.  (R. 525).  She noted, "Re-review ... Dr. Schulman.  Have the requested information in file.  SEQY in file, WAIS/TRAILS/WMS in file, dated 08/11/07.  All information in file.  Need a PRTF please.  Thank you."  <u>Id.</u>

Dr. Schulman responded on August 22, 2007, stating he had "completed prtf/mrfc for voc denial to simple activity."  <u>Id.</u> at 526.  As stated in his response, Dr. Schulman

provided the requested PRTF and MRFC forms.  Id. at 527-44.  As the ALJ recognized,

Dr. Schulman found severe mental impairments based on Listings 12.02, 12.08, and

12.09, but not on Listing 12.05.  Id. at 527, 528, 534-35.  Dr. Schulman also discussed

Plaintiff's mental status examination and intellectual functioning:

> Independent mental status examination was completed 6/0/76/30/7[1] [sic]
> and suggested reduced cognitive functioning.  Additional evaluation was
> completed 8/11/7 and indicated borderline intellectual functioning with
> verbal IQ 70, performance 80, and full scale 73.  Trails AB suggested some
> mild visual/spatial problems.  Memory functioning was more variable and
> generally consistent with intellectual functioning.  The mental status
> examiner and tester indicated claimant was capable of simple intermediate
> vocational activity based on the examinations.

(R. 539).

Significantly missing from Dr. Schulman's analysis, Dr. Kravitz's testimony, and

the ALJ's decision is any consideration whether the IQ scores achieved in testing were

valid.  Because Dr. Schulman found, based in part on the IQ scores, that Plaintiff has an

organic mental disorder, one might argue that he found the scores valid.  However,

because Dr. Schulman found borderline intellectual functioning rather than mild mental

retardation, one might also argue that he found the IQ scores invalid.  Determination of

these issues is further complicated by the fact that neither Dr. Schulman, Dr. Kravitz, nor

the ALJ appears to have recognized Dr. Mintz's notation that Plaintiff was in special

education in school nor Plaintiff's disability report in which he noted that he was in

---

[1]Obviously this is a typographical error.  Because Dr. Mintz performed the record
mental status examination on June 30, 2007, the court finds that this should be "6/30/7."

special education classes in elementary school and in high school.  (R. 302-03, 513).  Dr. Mintz's notation along with Plaintiff's report constitutes record evidence of the potential that Plaintiff's condition meets the first criterion, the capsule definition of Listing 12.05-- deficits in adaptive functioning initially manifested during the developmental period:  i.e., the evidence demonstrates or supports onset of the impairment before age 22.

This fact is the most telling reason the <u>Bland</u> case is not persuasive authority here. In <u>Bland</u>, the court found that Mr. Bland did not meet the capsule definition of mental retardation, and based that finding in large part on the fact that "Mr. Bland completed the 11th grade taking regular classes (although with low grades); he was never in special education classes at school."  <u>Bland</u>, 432 F. App'x at 723.  Here, the fact that Plaintiff <u>was</u> in special education classes in school suggests that perhaps Plaintiff meets the capsule definition, and distinguishes this case from <u>Bland</u>.

As discussed above, the ALJ erred in this case by failing to secure the testing and report of Plaintiff's IQ performed on August 11, 2007, and by failing to consider Listing 12.05C in conjunction with that report.  Remand is necessary for the Commissioner to secure that report or to procure additional WAIS III, WMS III, and TRAILS testing, and to consider whether Plaintiff's condition meets or equals Listing 12.05C for mild mental retardation.  In light of Dr. Mintz's notation and Plaintiff's report that Plaintiff was in special education, it would also be appropriate for the Commissioner to contact the schools in which Plaintiff allegedly attended special education classes (R. 302-03) to

secure records relating to whether the evidence demonstrates or supports onset of the

impairment before age 22.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is

REVERSED, and that judgment shall be entered pursuant to the fourth sentence of 42

U.S.C. § 405(g) REMANDING this case for further proceedings.

Dated this 30th day of October 2012, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**